Leonard GRECO and Karen Greco, his wife, Appellants,

v.

Charles ROBINSON, Steven C. Robinson, and R.E.P., Ltd., Respondents.

No. 52418.

Missouri Court of Appeals, Eastern District, Division Four.

March 22, 1988.

Joseph R. Dierkes, St. Louis, for appellants.

Heather S. Heidelbaugh, Dana A. Hockensmith, St. Louis, for respondents.

GRIMM, Judge.

Appellants Leonard and Karen Greco filed a three count petition alleging conversion, wrongful eviction, and "outrageous conduct-prima facie tort." Pre-trial, a motion for summary judgment on the "outrageous conduct-prima facie tort" count was sustained. In the trial before a jury, at the conclusion of the Grecos' evidence, a motion to dismiss filed by Steven Robinson and R.E.P., Ltd., was sustained. The jury returned verdicts in favor of respondent Charles Robinson.

On appeal, the Grecos allege that the trial court erred in (1) failing to grant a new trial based on after-trial affidavits relating to testimony given by a witness, (2) granting a motion for summary judgment on the "Outrageous Conduct-Prima Facie Tort" count, (3) excluding evidence of "mental or emotional distress" in the conversion and wrongful eviction counts, (4) failing to restrict cross examination, (5) sustaining a motion for directed verdict for two defendants, and (6) giving an incorrect converse instruction. Finding no reversible error, we affirm.

In August, 1981, the Grecos leased an apartment on Lonedell Road in Arnold, Missouri. The property was owned by Sandia Construction Company, whose sole stockholders are Charles and Sylvia Robinson. This property is managed by R.E.P.,

Ltd., whose sole stockholder is Charles' son, Steven.

Throughout 1981 and 1982, the Grecos were habitually late in their payment of rent. R.E.P. often served or mailed Notices of Overdue Rent and Termination to the Grecos. As a result, the Grecos often had to pay a ten dollar late rent fee. Between August, 1981, and August, 1982, at least twice the utility companies turned off all utilities due to the non-payment of bills.

On July 20, 1982, the Grecos paid the rent due July 1, plus the ten dollar fee. The bank returned the check due to insufficient funds, but apparently cleared it the second time. At this time, Leonard told Steven that the August rent would also be late; "probably come in around the 15th or 16th."

On August 10, according to Rebecca Classe, Charles' part-time receptionist, Leonard called the Robinson office and stated he could not pay his rent; he was leaving town because his wife had left, and he was going to Indiana to look for her. Leonard, on the other hand, said that he and his wife left Arnold together around August 10 to go to Indianapolis; he denied making any phone calls from Indianapolis back to the Robinsons.

Classe further said that Leonard called on August 19 and wanted to talk to Charles. She put Charles on the line, but she stayed on and listened to the conversation. She heard Leonard tell Charles he couldn't pay the rent and he wanted to get out of the lease. He asked Charles if there was any way to do that; Leonard suggested that their "stuff" be moved out to stop the rent and the late rent charge. Charles agreed to store the "stuff" in the apartment basement and, according to Classe, Leonard "gave the okay to do so as soon as possible." Charles basically confirmed Classe's testimony, agreeing to store the items for a week or two. However, Leonard testified that he did not give anyone permission to move his property from the apartment.

Leonard testified that he, his wife, and his son returned to Arnold at 2:00 a.m. on August 20. When they arrived at their apartment, Leonard found that his key did not work and they could not get in. They saw that the apartment was empty. Leonard then called Steven who told him that he had been evicted, his property was in the basement at the office, and he was to meet Charles at his office the next morning.

Leonard went to Robinson's office the next morning. Testimony regarding who was present and what conversation took place is contradictory. Leonard said Charles, Steven, and Rebecca Classe were present; Charles said he and Classe were present; while Classe said she and Charles were present and that Steven walked in later. Karen Greco remained outside in the car.

Leonard testified that he asked to see his property and asked to resume living in the premises. According to Leonard, he was told that he could not because the apartment was already rented out. Leonard was then given a document, and was told that he had to sign it before he could get his property back. Leonard signed, and then went outside and talked to his wife; she refused to sign. He then went back inside and laid it on Charles' desk, and left. The next day, the Grecos went to Robinson's office; he let them look at their property for five minutes, but told them they couldn't take anything until Karen signed the release, which she did not do. They went back two days later, without any success, and then contacted a lawyer. On August 25, they went to Indianapolis, returning to Arnold on September 1. At that time, they went to Robinson's, Karen signed the "release," and obtained their property.

Charles, on the other hand, testified that he did not remove the Grecos' belongings until after lunch on August 20, and he did not see Leonard until the morning of August 21. At that time, Leonard asked "[I]f I got everything out of the apartment." Charles told him yes, and Leonard then went to the basement to look at his belongings. Steven handed Leonard a Notice to Terminate Tenancy. Charles gave Leonard an "affidavit" to "hold harmless the lessor" from claims arising from the initial

lease; Leonard signed immediately and then took it out to his wife for her to sign. She refused to sign. Leonard said that he would come back later; that he didn't have any way to haul things.

The first issue we consider is whether the trial court erred in denying the Grecos' motion for new trial based on after-trial affidavits relative to Classe's testimony at trial. The affidavits indicate that Classe worked at her regular job in Maplewood from 7:30 a.m. to 4:00 p.m. on August 10, 19, 20, and 23, as well as September 1. They assert that this information is inconsistent with her trial testimony; that these inconsistencies did not come to their attention until after the trial; and that the trial court erroneously failed to grant them a new trial based on this newly discovered evidence. We disagree.

■■■ First, and foremost, this point was not raised in the motion for new trial, and therefore is not before us on appeal. Although the motion for new trial was timely filed on August 12, 1986, the only reference in the motion to Classe's testimony was on a complaint that the verdict was against the weight of the evidence. The affidavits were filed with the trial court on November 6, 1986, as attachments to "Plaintiff's Suggestions in Support of Motion for New Trial." A party may not add a new point to a motion for new trial under the guise of making "Suggestions." A motion for new trial may not be amended to add a new point after the expiration of the time provided by court rule. *Morgan v. Wartenbee*, 569 S.W.2d 391, 396 (Mo.App. W.D.1978). As such, any amendment filed out of time is a nullity. *Lloyd v. Garren*, 366 S.W.2d 341 (Mo.Div.1 1963). Thus, this complaint of the Grecos is not before us.

■■■ Even if the Grecos' complaints about Classe's testimony were timely filed in a motion for new trial, the trial court's ruling would not be disturbed. Motions for new trial on the basis of newly discovered evidence are addressed to the sound discretion of the trial judge, are viewed with disfavor, and are granted only in exceptional circumstances. *City of Eureka v. Hall*, 687 S.W.2d 917, 920 (Mo.App.E.D.1985);

*Morgan, Id.* at 399. We have carefully compared the affidavits with the trial testimony, and we find no abuse of discretion by the trial court in denying a new trial on this basis. We also note that Classe's name (although possibly misspelled) was known to the Grecos some 3½ months before trial, as well as the fact that she was a witness to certain events on August 10, 19, and 21, and on September 1. As a result, the information contained in the affidavits could have been determined before trial. Point denied.

Grecos' next point is that the trial court erred in granting Robinson's motion for a summary judgment on Count III, which they titled "Outrageous Conduct—Prima Facie Tort." These issues are raised in the context of Robinson's alleged refusal to return Grecos' property before a release from liability was signed. We find no error in the granting of this summary judgment.

A trial court may grant a summary judgment only when there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Supreme Court Rule 74.04(c). When reviewing a trial court's ruling on a motion for summary judgment, this court should scrutinize the record in the light most favorable to the party against whom the motion for summary judgment was filed and against whom judgment was rendered. *Hill v. Air Shields, Inc.*, 721 S.W. 2d 112, 115 (Mo.App.E.D.1986).

■■■ Here, we look at both theories in the light most favorable to the Grecos to determine if there is a genuine issue of material fact. The doctrine of prima facie tort has been recognized in Missouri as a remedy for intentional malicious acts. *Porter v. Crawford and Company*, 611 S.W.2d 265, 272 (Mo.App.W.D.1981). The elements of a prima facie tort are: (1) an intentional lawful act by the defendant; (2) an intent to cause injury to the plaintiff; (3) injury to the plaintiff; (4) an absence of any justification, or an insufficient justification, for the defendant's act. *Porter* at 268; *See generally*, Restatement (Second) of Torts § 870, (1979).

■ Here, the Grecos have not met the first element of a prima facie tort, i.e., an intentional lawful act by the defendant. Although an original and two amended petitions were filed, none of them contain an allegation that the Robinsons did "an intentional *lawful* act." The Grecos' petition alleges that the Robinsons subjected the Grecos "to physical, psychological and financial harassment and duress to coerce" them into signing the release. "Generally speaking, duress may be said to exist whenever one, by the unlawful act of another, is induced to make a contract or to perform some other act under circumstances which deprive him of the exercise of free will." 25 Am.Jur.2d Duress § 1. A release obtained by harassment, duress, and coercion is not "an intentional lawful act," therefore, the first element is not met. Since all four elements must be pled, the Grecos did not plead a prima facie tort.

■ The doctrine of intentional infliction of emotional distress (sometimes referred to in cases as "outrage" or "outrageous conduct") is established when a plaintiff shows: (1) defendant's conduct was extreme and outrageous, (2) defendant acted in an intentional or reckless manner, and (3) such conduct resulted in plaintiff suffering severe emotional distress. *Hayes v. Dunn,* 709 S.W.2d 164 (Mo.App.E.D.1986).

On the morning of trial, the court took up pending motions in chambers, including the motion for summary judgment. At that time, the trial judge stated that he had been informed by the Grecos' counsel that neither of them consulted with a doctor, entered into a hospital, or received any medical treatment; further, that no physician would testify as to their mental condition as a result of the items complained of in the petition.

Thereafter, the Grecos' counsel stated that the Grecos would testify "as to periods of nervousness, headaches, stomach problems that went on during the wrongful acts" alleged in the petition. Counsel then commented that he did not think absence of expert medical testimony should be determinative, but that the party's own testimony should be sufficient. Finally, he said

that the "fact that he [sic] did not obtain medical treatment at that time should not" determine their ability to testify about physical and emotional problems. The trial court sustained the motion for summary judgment on the basis that expert testimony would be necessary to raise the Grecos' testimony "to a provable point" regarding emotional distress.

■ The emotional distress required for the tort of intentional infliction of emotional distress "must be medically diagnosable and must be of sufficient severity so as to be medically significant." *Bass v. Nooney Co.,* 646 S.W.2d 765, 772 (Mo. banc 1983). Italized language in a footnote thereto emphasizes that the "mental distress [must be] serious enough to require medical attention." *Id.* at 773 n. 4 (quoting Comment, Negligence and the Infliction of Emotional Harm: A Reappraisal of the Nervous Shock Cases, 35 U.Chi.L.Rev. 512,517 (1968)). Thus, in *Hayes v. Dunn,* 709 S.W.2d 164 (Mo.App.E.D.1986), when the plaintiff did not see a doctor, but had felt nauseous, was nervous, had headaches, and bellyaches, and no medical evidence was offered, a judgment in favor of plaintiff was reversed because the evidence did not demonstrate that the stress was either "medically diagnosable" or "of sufficient severity to be medically significant." And in *Davis v. Shelton,* 710 S.W.2d 8 (Mo.App. W.D.1986), a motion for summary judgment granted by the trial court was sustained where answers to interrogatories disclosed that the plaintiff had "loss of sleep for a few nights" and nightmares, as well as "muscle twitching, weakness, disturbed sleep, stomach ache and unwarranted fears of walking and being hit by a motor vehicle." There, the plaintiff did not see a doctor until two weeks before the summary judgment hearing, and as a result, the plaintiff "did not satisfy the second prong of the *Bass* test, which requires that the 'emotional distress or mental injury be of sufficient severity so as to be medically significant.' *Id.* at 11. See also *Rooney v. National Super Markets, Inc.,* 668 S.W.2d 649 (Mo.App.E.D.1984); *Leonard v. Pioneer Finance Co.,* 568 S.W.2d

937 (Mo.App.W.D.1978); *State ex rel. Benz v. Blackwell*, 716 S.W.2d 270 (Mo.App.E.D. 1986); *Casey v. Casey*, 736 S.W.2d 69 (Mo. App.E.D.1987); and *Bockover v. Stemmerman*, 708 S.W.2d 179 (Mo.App.W.D.1986). Here, neither of the Grecos sought medical care as a result of the incident, nor did their complaints add up "to the type of emotional distress required to give a cause of action." *Leonard*, 568 S.W.2d at 942. Thus, the trial court did not err in granting the motion for summary judgment as it related to intentional infliction of emotional distress. Point denied.

The third issue is whether the trial court erred in sustaining defendant's motion in limine to exclude evidence "pertaining to alleged mental or emotional distress." The Grecos assert that evidence of emotional distress is relevant to damages on the issues of conversion (Count I) and wrongful eviction (Count II). We disagree.

■■■ Here, there were no allegations in the counts pertaining to conversion and forcible detainer of either physical or emotional injuries. Such allegations appear only in Count III, relating to prima facie tort and intentional infliction of emotional distress. Further, the claimed emotional injuries do not meet the *Bass* standard. Therefore, the trial court did not err in excluding the evidence.

Grecos' next point is that the trial court erred in permitting Robinson to cross-examine Leonard on collateral matters relating to gas service to the apartment. They assert that this matter was irrelevant, immaterial, inflammatory, and prejudicial. We disagree.

In the argument portion of their brief, the Grecos make reference to two instances of alleged error. The first occurred after Leonard had been asked if, when he left a previous rental unit, his utilities were delinquent. He answered, without objection, that he wasn't sure. Then he was asked if the Friday before the trial, he went to the gas company and paid that bill. He acknowledged paying $225 for gas on Lonedell, Ozarks Drive, and Crosswinds. He was then asked, "What induced you on Friday before this trial to go back and pay

the gas bill on Crossroads?" An objection of "not relevant" was made and overruled, and Leonard responded, "I knew that it would look better on me if I paid it."

The second occurred about twenty pages later in the transcript. Without objection, Leonard testified that when he applied for gas service at Crosswinds, he spelled his name G-r-e-c-o. Robinson's counsel then said, "So the gas company had you listed as - -." An objection of "not relevant" was made and overruled. Leonard then acknowledged that when he applied for gas on Lonedell, he spelled it G-r-e-k-o. No objection was made when he was asked why, and he responded, "I knew if I put on the application G-r-e-c-o that I probably could not get the gas turned on, and my son was getting ready to start school."

■■■ A trial court may grant wide latitude on cross-examination, particularly in the case of a party who offers himself as a witness in a civil case. *Maul v. Filimon*, 315 S.W.2d 859, 866 (Mo.App.E.D.1958). On cross-examination, a witness may be asked any questions which tend to test his accuracy, veracity, or credibility, or to shake his credit by injuring his character. *Chism v. Cowan*, 425 S.W.2d 942, 948 (Mo. Div. 1 1967). The questions asked were permissible on the issue of credibility and were therefore relevant. Point denied.

The Grecos' next allege that the trial court erred in directing a verdict for Steven Robinson and R.E.P. Ltd., on the conversion and wrongful eviction counts at the close of the plaintiff's case. We find no error.

■■■ As to the conversion count, in order to prove that Steven converted the Grecos' property, the Grecos must show one of three things: (1) a tortuous taking, (2) use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the rights of the owner, or (3) a refusal to give up possession to the owner on demand. *Arnold v. Prange*, 541 S.W.2d 27, 30 (Mo.App.E.D. 1976). There was no evidence that Steven did any of those three things. Therefore,

the trial court did not err in sustaining the motion as it relates to the conversion count.

■ On the wrongful eviction count, the petition alleged that "the Defendants ... entered into said premises ..., took possession of said premises, and wrongfully evicted the Plaintiffs and their possessions from said premises." There was no evidence that Steven "entered" the premises, or "took possession" or participated in the wrongful eviction. All of the Grecos' evidence established that Charles was the one who personally did those acts. Point denied.

The Grecos' final point is that the trial court erred in giving Instruction Number 12, which is a converse instruction. The Grecos claim that the instruction "incorrectly stated the law of conversion, and permitted the jury to return a verdict in favor of defendant even if a conversion had been committed." We disagree.

Here, in effect, the Grecos claim that Charles' offered instruction was not an accurate converse of their verdict directing instruction. The Grecos submitted instruction number 9 as their verdict director (there is no applicable MAI verdict directing instruction for conversion). It reads:

Your verdict must be for Plaintiffs Leonard Greco and Karen Greco on their claim for conversion of personal property against Defendant Charles Robinson if you believe:

First, on or about the 19th day of August, 1982, Plaintiffs were in lawful possession of the personal property located on the premises at 2335 Lonedell, Arnold, Missouri, and

Second, either:

On or about August 19th, 1982, without consent of the Plaintiffs, Defendant Charles Robinson removed or directed the removal of said personal property from those premises, or

On or after August 19, 1982, without consent of the Plaintiffs, Defendant Charles Robinson took possession of said personal property, and refused to return said personal property to the Plaintiffs, after Plaintiffs had requested the return of said personal property, and

Third, Plaintiffs were thereby damaged, and

Fourth, the release executed by the Plaintiffs is invalid as having been obtained by duress.

Although Charles' converse Instruction Number 12, was labeled MAI 33.05 (modified), as indicated later, it was more than "modified." It says:

Your verdict must be for Defendant Charles Robinson on Plaintiff's claim for conversion if you believe:

First, Plaintiffs consented to the removal of the personal property from the premises, or

Second, Defendant did not refuse to return Plaintiffs' personal property, or

Third, the release executed by Plaintiffs was not obtained by duress.

The Grecos assert that Instruction Number 12 is not a proper affirmative converse because they submitted two alternative paragraphs Second and the converse was not sufficient to defeat the entirety of their claim.

■ In paragraph Second of the verdict director, the Grecos submitted (1) "without consent of the plaintiffs, Charles Robinson removed or directed the removal of" property or (2) "without consent ... Charles Robinson took possession ... and refused to return ... property." In both alternatives, the instruction required that the action occur "without consent of the plaintiffs." Paragraph First of the converse directed a verdict for Charles if the "Plaintiffs consented to the removal." Since under either theory submitted by the Grecos, the removal or taking had to occur "without consent" of the Grecos, paragraph First of the converse was proper.

In paragraph Fourth of the verdict director, the Grecos submitted that the release was "invalid as having been obtained by duress." Paragraph Third of the converse in effect negated the verdict director and would have been a proper "true converse." A true converse instruction begins "Your verdict must be for defendant unless you believe" and requires no independent evidence to support it. On the other hand, an affirmative converse begins "Your ver-

dict must be for defendant if you believe" and requires independent evidence to support it. MAI 33.01. The Grecos cannot complain that duress was submitted as an "affirmative converse," for in so doing, Charles took on the burden to present independent evidence to support it. Thus, whether the jury believed that the Grecos' proof failed on the release/duress issue or believed Charles' affirmative evidence in that regard is immaterial.

 Under paragraph Second of the verdict director, the second submission, in order to return a verdict, a jury had to find that Charles "without consent took" property *and* "refused to return" it after requested to do so. As indicated above, paragraph First of the converse instructed on the issue of "without consent" and paragraph Second addressed the second part of this submission with "did not refuse to return" the property. Thus, together, they conversed the second submission in paragraph Second. Although the Grecos now argue that paragraph Second of the converse could be utilized by the jury to improperly defeat the first alternative in paragraph Second of the Grecos' verdict director, there is nothing in the trial transcript which indicates that any such objection was made at trial. Although objection at trial is not necessary to preserve instructional error, its absence may be considered in assessing prejudicial effect. *Crabb v. Mid-American Dairymen, Inc.*, 735 S.W. 2d 714, 718 (Mo. banc 1987). The closing arguments of counsel are relevant in determining prejudicial effect, however, the transcript does not include those arguments. Failure of the Grecos to include these arguments is fatal to their argument of prejudice. *Frederick v. Witthaus*, 736 S.W.2d 520 (Mo.App.E.D.1987). Point denied.

The judgment is affirmed.

SIMON, P.J., and CRANDALL, J., concur.